FILED
2016 Feb-02  AM 09:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **SHERRY HULETT,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 2:14-CV-1892-VEH** |
| | ) |
| **CAROLYN W. COLVIN, ACTING** | ) |
| **COMMISSIONER, SOCIAL** | ) |
| **SECURITY ADMINISTRATION,** | ) |
| | ) |
| **Defendant.** | ) |

---

## MEMORANDUM OPINION[1]

Plaintiff Sherry Denese Hulett ("Ms. Hulett") brings this action under 42 U.S.C. § 405(g), Section 205(g) of the Social Security Act. She seeks review of a final adverse decision of the Commissioner of the Social Security Administration ("Commissioner"), who denied her application for Disability Insurance Benefits

---

[1] Carolyn W. Colvin was named the Acting Commissioner on February 14, 2013. *See* http://www.socialsecurity.gov/agency/colvin.htm ("On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security.") (last accessed on February 1, 2016). Under 42 U.S.C. § 405(g), "[a]ny action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office." Accordingly, pursuant to 42 U.S.C. § 405(g) and Rule 25(d) of the Federal Rules of Civil Procedure, the court has substituted Carolyn W. Colvin for Michael Astrue in the case caption above and **HEREBY DIRECTS** the clerk to do the same party substitution on CM/ECF.

1

("DIB"). Ms. Hulett timely pursued and exhausted her administrative remedies available before the Commissioner. The case is thus ripe for review under 42 U.S.C. § 405(g).[2]

## I.    FACTUAL AND PROCEDURAL HISTORY

Ms. Hulett  was 52 years old at the time of her hearing before the Administrative Law Judge ("ALJ"). (Tr. 49, 88). She has completed two years of college. (Tr. 198). Her past work experience includes employment as a gate guard and a security console operator. (Tr. 73). She claims she became disabled on September 11, 2012, due to congested heart failure, fibromyalgia, diabetes mellitus, and lupus. (Doc. 10 at 2). Her last period of work ended on September 11, 2012. (Tr. 69).

On April 11, 2011, Ms. Hulett protectively filed a Title II application for a period of disability and DIB. (Tr. 41). On July 22, 2011, the Commissioner initially denied these claims. *Id.* Ms. Hulett timely filed a written request for a hearing on September 19, 2011. *Id.* The ALJ conducted a hearing on the matter on March 15, 2013. *Id.* On April 8, 2013, he issued his opinion concluding Ms. Hulett was not disabled and denying her benefits. (Tr. 49).  She timely petitioned the Appeals Council to review the decision on June 3, 2013. (Tr. 36). On September 19, 2014, the

---

[2]42 U.S.C. § 1383(c)(3) renders the judicial review provisions of 42 U.S.C. § 405(g) fully applicable to claims for SSI.

Appeals Council issued a denial of review on her claim. (Tr. 1-7).

Ms. Hulett filed a Complaint with this court on October 6, 2014, seeking review of the Commissioner's determination.  (Doc. 1).  The Commissioner answered on January 9, 2015. (Doc. 8).  Ms. Hulett filed a Statement of Claim (Doc. 10), and the Commissioner filed her own responding brief (Doc. 13) on March 30, 2015. With the parties having provided these documents, the court has carefully considered the record and affirms the decision of the Commissioner.

## II.    STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). This court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* It is "more than a scintilla, but less than a preponderance." *Id.*

This court must uphold factual findings that are supported by substantial evidence. However, it reviews the ALJ's legal conclusions de novo because no

presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, it must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.   STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability benefits and establish his or her entitlement for a period of disability, a claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.[3] The Regulations define "disabled" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence about a "physical or mental impairment" that "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20

---

[3]The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499, revised as of June 26, 2014.

C.F.R. § 404.1508.

The Regulations provide a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). The Commissioner must determine in sequence:

(1)    whether the claimant is currently employed;

(2)    whether the claimant has a severe impairment;

(3)    whether the claimant's impairment meets or equals an impairment listed by the [Commissioner];

(4)    whether the claimant can perform his or her past work; and

(5)    whether the claimant is capable of performing any work in the national economy.

*Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993) (citing to formerly applicable C.F.R. section), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561, 562-63 (7th Cir. 1999); *accord McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). The sequential analysis goes as follows:

Once the claimant has satisfied steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have a listed impairment but cannot perform her work, the burden shifts to the [Commissioner] to show that the claimant can perform some other job.

*Pope*, 998 F.2d at 477; *accord Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). The Commissioner must further show that such work exists in the national economy in significant numbers. *Id.*

5

## IV.   FINDINGS OF THE ADMINISTRATIVE LAW JUDGE

After consideration of the entire record, the ALJ made the following findings:

1.   Ms. Hulett met the insured status requirements of the Social Security Act through March 31, 2015.

2.   She had not engaged in substantial gainful activity since September 11, 2012, the alleged disability onset date.

3.   She had the following severe impairments: congestive heart failure, diabetes mellitus, obesity, and atrial fibrillation status post ablation.

4.   She did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.   She had the residual functioning capacity ("RFC") to perform the full range of sedentary work.

6.   She was able to perform her past relevant work as a gate guard and a security console operator.

7.   Ms. Hulett had not been under a disability, as defined in the Social Security Act, from September 11, 2012, through the date of this decision.

(Tr. 43-49).

## V.   ANALYSIS

The court may only reverse a finding of the Commissioner if it is not supported by substantial evidence. 42 U.S.C. § 405(g). "This does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th

6

Cir. 1980)).[4] However, the court "abstains from reweighing the evidence or substituting its own judgment for that of the [Commissioner]." *Id.* (citation omitted).

Ms. Hulett, who is proceeding pro se in this appeal,[5] urges this court to reverse the Commissioner's decision to deny her benefits on the grounds that the ALJ "is in error in light of her medical record, testimony, and employment limitations." (Doc. 10 at 2). She contends that her "level of medical health severity (congested heart failure, fibromyalgia, diabetes and lupus) has rendered [her] unable to work." *Id*. Although the ALJ limited his finding of her residual functional capacity ("RFC") to the ability perform the "full range of sedentary work," (Tr. 45), Ms. Hulett is effectively seeking a finding of disability at all levels of exertion.

A. <u>The ALJ Did Not Err in Finding That Fibromyalgia Was Not a Medically Determinable Condition as to Ms. Hulett</u>

Ms. Hulett contends that she suffers from the severe medical impairment of fibromyalgia. (Doc. 10 at 2). However, the ALJ found that Ms. Hulett's "alleged fibromyalgia is not medically determinable." (Tr. 44). His reasoning was that, "[Ms. Hulett] does not receive any treatment for this alleged impairment and there is no

---

[4] *Strickland* is binding precedent in this Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981).

[5] Even though she is proceeding pro se before this court, she was represented by legal counsel at the administrative level. (Tr. 67).

evidence of a diagnosis of fibromyalgia in the objective evidence of record...." (*Id*.). This court agrees with the ALJ, and finds that Ms. Hulett has not met her burden of proving she suffers from the severe impairment of fibromyalgia because she has not established the presence of a medically determinable impairment.

Objective evidence from an acceptable medical source is necessary to establish the presence of a severe impairment. 20 C.F.R. § 404.1513(a); *Elam v. Railroad Retirement Bd.*, 921 F.2d 1210, 1215 (11th Cir.1991) ("While both the regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself."). To prove she suffers from fibromyalgia, Ms. Hulett must provide "medical evidence consisting of signs, symptoms, and laboratory findings" which establish the presence of the impairment, and not rely solely on her statements of symptoms. 20 C.F.R. § 404.1508.

Fibromyalgia is a medical impairment that complicates Social Security disability determinations, because the condition "often lacks medical or laboratory signs, and is generally diagnosed mostly on an individual's described symptoms." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). The Social Security Administration has acknowledged that fibromyalgia is not detectable through diagnostic tests, but rather through medically accepted clinical techniques that show

the existence of an impairment. *Id.* (citation omitted). Therefore, it is possible to objectively diagnose a patient with fibromyalgia despite the complicated nature of the condition.[6]

Ms. Hulett testified at the administrative hearing that she was diagnosed with fibromyalgia in about 2008. (Tr. 78). She noted in her Disability Report that she has sought medical treatment for the condition from Dr. Mitchell Scott Tougher and Dr. Asuru from the Birmingham Health Clinic. (Tr. 202). However, none of the physicians she listed as evaluating and treating her for the condition of fibromyalgia made any mention of the impairment on their reports or in their clinical notes. (Tr. 239-258). The only conditions that the physicians diagnosed and treated during these visits were type II diabetes, hypertension, hyperlipidemia, and obesity. (*Id.*). There is no notation or recording in the reports of any "trigger point" testing and palpitations

---

[6] The court noted, in *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996), that "[t]here are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character—multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch." Judge Guin cited *Sarchet* in his opinion in *Reliford v. Barnhart*, 444 F.Supp.2d 1182 (N.D. Ala. 2006). Judge Guin wrote: "[i]n spite of its illusive nature, the presence of fibromyalgia can be objectively verified in some cases. As noted in *Sarchet*, there are tender areas, or "trigger points," which are well defined and cause pain upon palpitation. Objective, clinical support for a diagnosis of fibromyalgia may also be present if injections of pain medication to the trigger points are prescribed. *Kelley*, at 589 (diagnosis of fibromyalgia is clinically supported by trigger point injections). Clearly, then, fibromyalgia if properly diagnosed satisfies the pain standard." *Id*. at 1187.

performed on Ms. Hulett in an attempt to diagnose fibromyalgia, and there is no evidence of prescribed treatment or medication that would address the condition. (*Id*.).

Furthermore, the court carefully scrutinized the record to find any evidence that may potentially be construed as a diagnosis, treatment, or testing for fibromyalgia,[7] but the record contained no such evidence. Although fibromyalgia has been listed in some of the clinical reports, these brief references were only in the context of past medical history,[8] problem lists,[9] and impressions,[10] and not as an actual medical diagnosis of the condition.[11] Similarly, there is no indication in the record that Ms.

_____

[7] As Ms. Hulett is a pro se appellant, the court carefully searched each page of the record for any indication in the medical source evidence of a diagnosis and treatment for fibromyalgia.

[8] The pages in the record which refer to fibromyalgia in the context of past medical history are Tr. 362, 366, 367, 369, 372, 478, 484, 485, 490, 491, 504, 508, 516.

[9] The page in the record which refers to fibromyalgia in the context of a problem list is Tr. 483. However, Dr. Jason Guichard, the UAB Highlands attending physician, also noted next to fibromyalgia that the problem was "[r]esolved," but made no indication of a diagnosis or prescribed treatment for the problem. (Tr. 483).

[10] The page in the record which refers to fibromyalgia in the context of impressions is Tr. 474. Although fibromyalgia is listed under impressions, Dr. Melissa Smallfield of the Kirklin Clinic did not indicate any follow-up diagnosis of the condition or treatment to address the symptoms.

[11] In clinical notes from The Kirklin Clinic, fibromyalgia was briefly listed in past medical history and impressions, but no definitive diagnosis was made or treatment for the condition prescribed. (Tr. 362-375). Diagnostic testing and clinical techniques were performed in relation to Ms. Hulett's congestive heart failure, which is what the medical reports addressed. (*Id*.).

Although fibromyalgia is listed in the clinical notes from UAB Highlands in Ms. Hulett's past medical history, there is no evidence of a diagnosis or treatment for the condition. (Tr. 475-521). Furthermore, there is no mention of fibromyalgia whatsoever in the discharge summary from the hospital, only discussion of headaches, "atrial fibrillation with atrial flutter," and "[d]iabetes that is poorly controlled." (Tr. 475-76).

Ms. Hulett visited Dr. Richard Shelton at UAB for psychiatric treatment between January

Hulett has sought treatment or is receiving treatment for fibromyalgia. Even though no cure exists for fibromyalgia, physician's may prescribe medication that addresses the condition's symptoms. Ms. Hulett testified that she takes Tylenol to treat the pain she experiences from her alleged fibromyalgia, "until [she] can afford the medication that [she is] supposed to have." (Tr. 78). However, just like there is no indication of a medical diagnosis of the condition, there is no indication that a physician has ever prescribed any medication Ms. Hulett claims she is "supposed to have" to treat fibromyalgia. Therefore, the ALJ correctly determined that the record does not contain any evidence of a medical diagnosis or treatment for Ms. Hulett's alleged severe impairment of fibromyalgia.

Ultimately, Ms. Hulett bears the burden of proving that she suffers from a severe impairment. *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) ("It is also well settled that the claimant bears the initial burden of establishing a severe impairment that keeps him from performing his past work."). As Ms. Hulett has failed to provide any objective evidence from a medical source diagnosing or treating fibromyalgia, the ALJ did not err in determining that the condition is not medically

---

22, 2013, and February 27, 2013. (Tr. 435-443). During Ms. Hulett's first visit, Dr. Shelton completed a "UAB Psychiatry Clinician Diagnostic Interview Form." (Tr. 436-439). He listed fibromyalgia in the "Past Medical History" section, and noted the condition in his "Diagnoses" section under Axis III. However, this listing does not serve as a diagnosis of fibromyalgia, but as an acknowledgment that this condition may affect an understanding of the client's mental disorder.

determinable and he properly excluded it from his findings of Ms. Hulett's severe impairments.[12]

> ### B. The ALJ's Determination That Ms. Hulett's Mental Impairments Were Nonsevere is Supported by Substantial Evidence

Ms. Hulett also claims that her level of work activity is restricted because she suffers from depression.[13] (Tr. 81). She was diagnosed with major depressive disorder on January 22, 2013, by Dr. Richard Shelton at The University of Alabama at Birmingham (UAB). However, the ALJ determined that Ms. Hulett's "medically determinable mental impairment of major depressive disorder does not cause more than minimal limitation in [her] ability to perform basic mental work activities and is

---

[12] The same reasoning applies to Ms. Hulett's claim that she suffers from the severe medical impairment of lupus. Ms. Hulett's Statement of Claim asserts that she was diagnosed with lupus in September of 2012, and that her "medical records related to lupus will include joint pain, skin disorder and hair loss." (Doc. 10, at 2). However, no such evidence of a diagnosis or treatment can be found within the record. There is no mention of lupus in Ms. Hulett's medical records from UAB in December of 2012, which are her medical records from the date closest to the alleged date of diagnosis. (Tr. 512-521). Additionally, there is no indication in the UAB Psychiatry Department treatment notes from January 22, 2013, to February 27, 2013, that Ms. Hulett reported she suffers from lupus. (Tr. 435-443). The only mention of lupus anywhere within the record is during Ms. Hulett's period of hospitalization at UAB Highlands from March 16 to March 21, 2013. She was admitted to the hospital to treat poorly controlled diabetes and for atrial fibrillation with atrial flutter. (Tr. 475). Lupus was mentioned only in the context of past medical history, (Tr. 478, 484, 490, 504, 509), and in the context of a problem list under a resolved status (Tr. 483). Without evidence of a diagnosis or treatment for the disease, Ms. Hulett does not meet her burden of proving that she suffers from the severe medical impairment of lupus.

[13] "[I]t's basically I feel like I'm in such a hold with depression. I'm alone, I feel alone. And then I don't be around people. I just stay in my apartment and – or the bed because some of the times like I don't feel like getting up. And my depression have me aching all over my body. So it just takes me a long time to try to figure out what's what." (Tr. 81).

therefore nonsevere." (Tr. 44). Substantial evidence supports the ALJ's finding that Ms. Hulett's mental impairments do not impose any additional significant work-related limitations to be included in her RFC assessment.

Social Security Regulations provide the applicable standards for determining whether a mental disorder constitutes a severe impairment. The Regulations require Ms. Hulett to demonstrate that she has suffered a mental impairment that has lasted, or can be expected to last, for a period of twelve months and is so severe as to prevent her from be able to perform her past relevant work. 20 C.F.R. § 404.1505(a).

The record shows that Ms. Hulett received psychiatric treatment from UAB for major depressive disorder between January 22, 2013, and February 27, 2013.[14] (Tr. 435-443). She testified that she's suffered from depression for years,[15] but her symptoms had gotten significantly worse by the time she first began to seek psychiatric treatment from Dr. Shelton at UAB (Tr. 84). In his initial assessment, Dr. Shelton gave Ms. Hulett a Global Assessment of Functioning (GAF) score of 45 with 50 as her maximum for the past year. (Tr. 439). Psychiatrists use The Global Assessment of Functioning Scale to assess the overall functioning on an individual,

---

[14] Although Ms. Hulett testified that she was still seeing Dr. Shelton at the time of the hearing on March 15, 2013, (Tr. 83), there are no medical records from Dr. Shelton after February 27, 2013.

[15] ALJ question: "[s]o you've had the depression for years?" Ms. Hulett's response: "[y]es." (Tr. 83).

and a score of 41-50 indicates the individual suffers from severe mental impairments in functioning. *McCloud v. Barnhart*, 166 Fed.Appx. 410, 418 (11th Cir.2006) ("In fact, a GAF score of 41–50 indicates severe impairments").  However, the ALJ is not required to rely on the GAF score in his ultimate determination as to whether a claimant's mental impairments impose severe limitations on the individual's work functioning.[16]

Ms. Hulett testified at the hearing that she has suffered from depression for a while.[17] (Tr. 83). At her initial assessment in January 2013, Dr. Shelton assigned Ms. Hulett a GAF score of 50 as a maximum for the prior year, indicating she was suffering from a severe mental impairment. (Tr. 439). Despite her depressed mental state, the record reflects that Ms. Hulett was still able to perform satisfactory work up until her alleged onset date of September 11, 2012. (Tr. 43, 56). As Ms. Hulett was still working during the period of time to which Dr. Shelton assigned a GAF score of 50, his GAF assessment is an inaccurate representation of Ms. Hulett's mental abilities.

In assessing the severity of her mental impairment, and the extent to which it

---

[16] The Commissioner has noted that the GAF scale ""does not have a direct correlation to the severity requirements in our mental disorders listings." 65 Fed.Reg. at 50764–65, cited in *Nye v. Commissioner of Social Sec.*, 524 Fed.Appx. 538 (11th Cir.2013).

[17] Ms. Hulett answered "[y]es" to the ALJ's question "[s]o you've had the depression for years?" (Tr. 83).

limits an individual's ability to function, the ALJ discussed the four criteria Regulations requires courts to consider: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. Pt. 404, Subpt. P, App. 1. 12.00(C). The ALJ referred to evidence in the record provided by Ms. Hulett to support his determinations with respect to these four broad functional areas. (Tr. 44-45).

The ALJ determined that Ms. Hulett only suffers a "mild limitation in activities of daily living," and in her "concentration, persistence, or pace." (Tr. 44). In doing so, the ALJ referred to Ms. Hulett's Function Report, and recognized her ability to conduct her daily activities independently.[18] (Tr. 44). To be sure, Ms. Hulett suffers some limitations in these areas, but she reports that they are mostly caused by her physical limitations, including pain and shortness of breath, and does not refer to any mental impairments. (Tr, 214-221). Additionally, the ALJ noted that Ms. Hulett's "attention span varies depending on her pain levels," but he also explained that Ms. Hulett "indicated she could follow instructions." (Tr. 44). Ms. Hulett's responses in the Function Report also supports this determination.[19] (Tr. 219).

---

[18]   The ALJ wrote: "The claimant is independent in her personal care and hygiene, can cook her own meals, and does housework during the day, requiring small breaks due to shortness of breath." (Tr. 44). The ALJ's observations here are reflected in the Function Report provided completed by Ms. Hulett. (Tr. 215-218).

[19]   Ms. Hulett reported that she could pay attention for a "few min[utes]" when she is "out of pain." (Tr. 219). However, she also reported that she can follow written and spoken

The ALJ's determination is also supported by the UAB psychiatric treatment notes. Although Dr. Shelton notes in his initial assessment that Ms. Hulett suffers severe aches and pains and is susceptible to daytime napping, he observed that she presents normal behavior, speech, affect, thought process, cognition, insight, and judgment. (Tr. 43). He also opined that Ms. Hulett is only moderately ill. (Tr. 440, 441, 442, 443). These limitations are allowed for in the ALJ's findings given that he determined Ms. Hulett suffers "mild limitations" as opposed to "no limitations." Taking the evidence of the record as a whole, the ALJ's determination that Ms. Hulett only suffers a mild limitation in these two broad functional categories is supported by substantial evidence.

In the other two functional areas, "social functioning" and "episodes of decompensation," the ALJ determined Ms. Hulett has no limitations as a result of her major depressive disorder. (Tr. 44). The ALJ again refers to Ms. Hulett's Function Report with regards to her social functioning, noting that she reported that she attends church and that she gets along well with authority figures. (Tr. 44). In this report, Ms. Hulett wrote that she attends church twice a month and she checked the "no" box in answering the question as to whether she has "any problems getting along with family, friends, neighbors or others." (Tr, 218-19). Although Ms. Hulett testified that she is

_____

instructions "okay." (*Id*.).

16

not capable of being around people,[20] she replied "okay" to how well she gets along with authority figures, and checked "no" to ever having "been fired or laid off from a job because of problems getting along with other people." (Tr. 220).

The ALJ also determined that Ms. Hulett has not experienced any episodes of decompensation for an extended duration. Although Ms. Hulett testified that her symptoms of depression worsened in January 2013, the ALJ noted that she attended "regular weekly therapy session[s] for one month's duration," and that she "quit seeking treatment in February 2013." (Tr. 44). This determination is supported by the medical evidence in the record.[21] Thus, the record demonstrates that Ms. Hulett's mental impairments did not cause any significant work-related limitations to her functional abilities in these two broad areas.

Substantial evidence supports the ALJ's determinations with regard to each of the four broad areas of Ms. Hulett's mental functioning. As none of Ms. Hulett's limitations in any of these areas, individually or taken together, significantly affects her ability to function effectively on a sustained basis, the ALJ did not err in his finding that Ms. Hulett's mental impairments are nonsevere. Thus, the ALJ's RFC

---

[20] Ms. Hulett testified: "I'm not able to really be around people. I'm short with people. I'm just not a person to be interacting around people because it'll cause me to go into a dark place." (Tr, 81).

[21] The record contains psychiatric treatment notes only for the period between January 22, 2013, and February 27, 2013. (Tr. 435-443).

assessment does not require any additional accommodations relating to Ms. Hulett's mental impairments.

### C. The ALJ Did Not Err in Finding that Ms. Hulett Has the Residual Functional Capacity To Perform the Full Range of Sedentary Work

The ALJ concluded that Ms. Hulett had the residual functional capacity (RFC) to perform the full range of sedentary work. (Tr. 45). Ms. Hulett disagrees, and asserts that the ALJ was "in error in light of her medical record, testimony, and employment limitations." (Doc. 10, at 2).

Social Security Regulations require the ALJ follow a two-step process when determining a claimant's functional ability considering her symptoms. 20 C.F.R. § 404.1529. First, the ALJ must consider whether there is a "medically determinable impairment that could reasonably be expected to produce [her] symptoms." *Id*. Second, the ALJ must evaluate the "intensity and persistence of [her] symptoms... and determin[e] the extent to which [her] symptoms limit [her] capacity for work. *Id*. This court finds that the ALJ applied this standard properly and that substantial evidence supports his RFC assessment.

In evaluating the limiting effect of Ms. Hulett's symptoms, the ALJ must consider her subjective testimony in determining the severity of her pain and is also required to consider the objective medical evidence. *See* 20 C.F.R. § 404.1529(a). "If the ALJ decides not to credit a claimant's testimony as to her pain, he must articulate

18

explicit and adequate reasons for doing so." *Foote v. Chater*, 67 F.3d 1553, 1561–62 (11th Cir.1995).

The ALJ found that Ms. Hulett's medically determinable conditions of congestive heart failure, diabetes mellitus, obesity, and atrial fibrillation status post ablation "could reasonably be expected to cause the alleged symptoms," but that Ms. Hulett's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 46). In making this determination, the ALJ considered the objective medical evidence with regard to each of Ms. Hulett's conditions, the effects of her medication on her functional abilities, and subjective evidence from Ms. Hulett regarding her daily activities. (Tr. 46-48).

Regulations provide that that sedentary work involves minimal lifting, and can be performed mostly in a seated position.[22] 20 C.F.R. § 404.1567(a). Ms. Hulett's assertions which contradict this finding relate to the alleged intensity of her pain. Ms. Hulett testified that, because of her pain, she is unable to work even if her work only requires her to sit in a chair.[23] (Tr. 76-77). However, the underlying condition of

---

[22] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

[23] "I'm not able to perform anything as far as sitting in a chair because the stiffness come and the pain come, and I'm just not able to sit." (Tr. 76-77).

fibromyalgia which Ms. Hulett alleges causes her this pain is not medically determinable for reasons stated above. Additionally, the ALJ found that Ms. Hulett's described daily activities show that her pain symptoms do not limit her to the extent of a sufficiently disabling condition. (Tr. 47-48). He noted Ms. Hulett's description in her Function Report demonstrate she is "independent in her personal care and hygiene in that she can dress herself, bathe, feed, and use the toilet without any assistance." (Tr. 48, 215). Additionally, she can go shopping once a month, and prepare simple meals and do household chores." (Tr. 48, 216-17). Although she testified that she has experienced this ongoing pain since 2011, she claimed that it had gotten worse towards the end of 2012,[24] after her alleged onset date. (Tr. 77).

Ms. Hulett's testimony is undermined by the lack of evidence in the record indicating Ms. Hulett has sought treatment for this pain. As the Commissioner's brief points out, Ms. Hulett's medical records from July 2012 report that Ms. Hulett stated "she has been feeling great" since she underwent atrial flutter ablation, and that "[s]he can do whatever activity she wishes without any shortness of breath and she denies any chest pain, palpitations, dizziness or syncope." (Tr. 362). Furthermore, the medical records from Ms. Hulett's latest course of hospitalization do not mention any

---

[24] "This started, the – well, the pain been for – from '11, really from '11, 2011, its been ongoing pain. But it seemed like it just got really worse. And then really this year it's really worse." (Tr. 77).

pain aside from headaches. (Tr. 475). Aside from these records, there are no medical records which support Ms. Hulett's allegations of severe pain. Therefore, the ALJ's RFC assessment allowing for sedentary work is supported by the lack of medical records presenting pain at the level of severity to which Ms. Hulett testified. *See Osborn v. Barnhart*, 194 F. App'x 654, 663 (11th Cir.2006) (Claimant's testimony regarding the level of severity of migraines headaches was not supported by medical records).[25]

With regard to the rest of Ms. Hulett's symptoms – shortness of breath,[26] the need for a twenty-minute break after taking her insulin shot,[27] and migraine headaches[28] – they have been accounted for by the ALJ's determination that Ms. Hulett can perform the full range of sedentary work. The medical evidence of record reflects that Ms. Hulett's migraine headaches improve with Tylenol. (Tr. 475). Furthermore, sedentary work involves seated work activities for the most part, which

---

[25] "[Osborn] testified that these migraines would last anywhere from a couple of hours to a couple of days, and sometimes they required an injection. None of the medical records, however, indicate that Osborn received injections for his migraines, nor did they reflect the level of severity to which Osborn testified." *Id.* at 662-63.

[26] Ms. Hulett testified that she experiences shortness of breath and heart palpitations as a result of her congestive heart failure and atrial fibrillation. (Tr. 78).

[27] At the Administrative Hearing, Ms. Hulett testified that she would have to wait twenty minutes after she takes her insulin shot. (Tr. 80).

[28] Ms. Hulett testified at the hearing that hypertension causes her to suffer migraine headaches which could last over thirty minutes and occur ten to fifteen times a month. (Tr. 80).

would accommodate Ms. Hulett when she needs to break to take her insulin shots and avoids rigorous activity which would cause her shortness of breath. Furthermore, many of Ms. Hulett's conditions existed before her alleged onset date, as established by Ms. Hulett's medical records. The only evidence the record contains which provides additional information after Ms. Hulett's alleged onset date is from UAB Highlands, (Tr. 475-521), and the UAB psychiatric treatment notes. (Tr. 435-443). As discussed above, the psychiatric treatment notes do not provide for a mental impairment of sufficient severity to constitute a severe medical condition. Additionally, the medical evidence from UAB Highlands pertained to Ms. Hulett's atrial fibrillation, which Ms. Hulett has not shown to be any worse at this time than it was before September 11, 2012.

Additionally, Ms. Hulett has supplemented her Statement of Claim with further medical evidence from the UAB Medical Center. (Doc. 10, at 3-41, Doc. 12). The Commissioner may consider new evidence presented for the first time in district court only if the evidence falls under sentence six of section 405(g). *Ingram v. Commissioner of Social Sec. Admin.*, 496 F.3d 1253, 1267 (11th Cir. 2007) ("Sentence six of section 405(g) provides the sole means for a district court to remand to the Commissioner to consider new evidence presented for the first time in the district court). For the district court to remand a case based on new evidence, the new

evidence must be material and there must be good cause for failing to previously present this evidence into the record.[29]

The new evidence Ms. Hulett submitted includes medical records from UAB Medical Center from March 4 to 5, 2015. (Doc. 12, at 1). In these records, Dr. Jeffrey Hawkins diagnoses Ms. Hulett with sleep apnea. *Id*. at 8. However, nowhere did the study Ms. Hulett participated in indicate that Ms. Hulett's sleep apnea was a disabling condition. *See Couch v. Astrue*, 267 Fed.Appx. 853, 857 (11th Cir. 2008) (finding additional evidence of sleep apnea study to not be new and material so as to warrant a remand of the ALJ's decision). Further, Dr. Hawkins noted that Ambien helped Ms. Hulett sleep. (Doc. 12, at 8). Therefore, this new evidence does not meet the applicable remand standard because the new evidence does not contradict the ALJ's findings of the severity of the limiting effects of Ms. Hulett's mental impairments.

Without further evidence indicating Ms. Hulett's impairments cause her greater limitations after her alleged onset date, the ALJ's finding that Ms. Hulett can perform the full range of sedentary work accommodates the limitations supported by the record taken as a whole. Therefore, substantial evidence supports the ALJ's RFC assessment, and thus substantiates the ALJ's conclusion that Ms. Hulett did not demonstrate a

---

[29]"The court may ... at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding ...." 42 U.S.C. § 405(g).

sufficiently severe disability.

    D. <u>The ALJ Did Not Err in Finding that Ms. Hulett Is Capable of Performing her Past Relevant Work</u>

    The ALJ determined that Ms. Hulett could perform her past relevant work as a gate guard and security console operator, given the physical and mental demands of this work.[30] (Tr. 48). Ms. Hulett disagrees, and points to the fact that she has "been terminated from two jobs because of [her] medical limitations." (Doc. 10, at 2).

    Social Security Regulations provide that the ALJ will use his RFC findings to determine whether Ms. Hulett can perform her past relevant work. 20 C.F.R. § 404.1560. The ALJ may rely on vocational expert testimony to compare the RFC assessment to the physical and mental demands of Ms. Hulett's past relevant work.[31] 20 C.F.R. § 404.1560(b).

    At the hearing, the vocational expert (VE) testified that Ms. Hulett's past

---

[30] The VE testified that Ms. Hulett performed "three types of security guard work." (Tr. 73). "One was a regular security guard. The other was – or another was working a security console at a bank. And then she was a gate guard." (*Id*.).

[31] "A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy. Such evidence may be helpful in supplementing or evaluating the accuracy of the claimant's description of his past work. In addition, a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally prformed in the national economy." 20 C.F.R. § 404.1560.

relevant work as a gate guard and security console operator are classified as semi-skilled work and can be performed at either the light or sedentary level of exertion.[32] (Tr. 73-74). The VE further testified that Ms. Hulett would be able to return to her past work as a security console operator and gate guard as she had performed them, should the ALJ find that she could perform work activity at the full range of sedentary work.[33] (Tr. 84-85). Additionally, the VE testified that Ms. Hulett's mental abilities would need to allow her to perform more than simple tasks to be able to return to her past work, because the security console operator and gate guard positions are semi-skilled jobs.[34] (Tr. 85).

Substantial evidence supports the ALJ's findings that Ms. Hulett has the RFC to perform work activity at the full range of sedentary work, (Tr. 45), and that her mental impairments do not cause more than a minimal limitation on her ability to perform basic mental work activities. (Tr. 44). According to the VE's testimony, these

---

[32] The ALJ asked the VE "The gate guard could be done at either the light or sedentary level as it is normally performed?" (Tr. 74). The VE responded, "[y]es, sir." (*Id*.). Additionally, the ALJ asked the VE whether "all these security guard positions [can] be performed at the sedentary level?" (*Id*.). The VE testified "yes, I mean not the patrolling security guard but the console operator and the gate guard." (*Id*.).

[33] The ALJ asked the VE: "[I]f I find that MS. Hulett could perform the full range of sedentary work, would she be able to return to any of her past work as it's normally performed or as she performed it in the local and national economy?" (Tr. 84-85). The VE testified: "[y]es, Your Honor…she could perform the seated gate guard duties as well as the security console operator." (Tr. 85).

[34] Question by the ALJ: "[s]o she would have to do more than simple tasks?" (Tr. 85). The VE responded with, "[o]h, yes, sir." (*Id*.).

limitations do not preclude Ms. Hulett from returning to her past relevant work as a security console operator and gate guard. Therefore, substantial evidence supports the ALJ's finding that Ms. Hulett is capable of performing her past relevant work and his ultimate determination that Ms. Hulett is not disabled.

## VI.   <u>CONCLUSION</u>

Based upon the court's evaluation of the evidence in the record and the parties' submissions, the court finds that the decision of the Commissioner is supported by substantial evidence and that she applied proper legal standards in arriving at it. Accordingly, the decision will be affirmed by separate order.

**DONE** and **ORDERED** this the 2nd day of February, 2016.

**VIRGINIA EMERSON HOPKINS**
United States District Judge